Filed 7/26/13  In re D.S. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.S., et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                    v.<br><br>Daniel S.,<br><br>        Defendant and Appellant. | F066091<br><br>(Super. Ct. Nos. JJV063751A & JJV063751B)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Jason Chu, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Daniel S. (father) appeals juvenile court orders terminating his parental rights to his daughter, Rebecca S., and establishing a legal guardianship for his daughter, D.S.,

under Welfare and Institutions Code[1] section 366.26.  Father contends the court erred by failing to find the beneficial parent/child relationship exception to adoption applied to preclude termination of his parental rights to Rebecca.  He also contends the court erred and denied him substantive due process by terminating visitation with D.  We affirm the orders.

### *FACTUAL AND PROCEDURAL BACKGROUND*

In January 2010, D., who was then nine years old, was hospitalized under section 5150, after assaulting her mother, L.K. (mother), Rebecca, and two other children in the home.  D. was diagnosed with acute posttraumatic stress disorder attributed to being exposed to a history of domestic violence between her parents.  In 2006, father was arrested and served a 360-day jail term after pleading guilty to spousal abuse.  During father's incarceration, mother and father divorced and mother obtained sole physical and legal custody of the children at that time.

Following D.'s hospitalization, mother requested assistance in placing D. based on her inability to protect Rebecca from D. or to protect D. from herself.  The respondent Tulare County Health and Services Agency (agency) initiated dependency proceedings and placed D. in a therapeutic foster home.

In May 2010, the juvenile court took dependency jurisdiction over D. under section 300, subdivision (c) (serious emotional damage).  The court removed D. from parental custody, and granted the parents reunification services.  The court also ordered weekly supervised visits.

As of mid-November 2010, the parents had complied with court-ordered services and consistently visited with D.  D. was anxious before visits with mother but suffered no anxiety before visits with father.  During visits, some of which included Rebecca, father

---

[1]     All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

was appropriate, interested, and engaging.  He brought snacks and activities for the children.

In a report for the six-month review hearing, the social worker expressed concern that, while the parents had made progress in their court-ordered services, they had made no progress in their ability to coparent.  They remained inflexible in the belief that they should have sole custody of the children with only visitation granted for the other parent.  The parents' ongoing family law case regarding Rebecca evidenced their inability to come to any agreement.  D. could not be returned home and expected to achieve stability in a home environment with neither parent showing any positive change in their outlook and behaviors.

According to a report prepared by CASA (Court Appointed Special Advocates) for the six-month review hearing, D. said she intentionally acted out to get what she wanted because she was used to this working with her parents.

In an addendum report, the social worker noted all supervised visits between father and D. were positive and his interactions demonstrated he was an effective parent.

At the six-month review hearing in early December 2010, the juvenile court ordered father to begin having some unsupervised visits with D.  The court ordered supervised visits to continue with mother, finding there was evidence unsupervised visits would be detrimental to D.

In early February 2011, the agency initiated dependency proceedings on behalf of Rebecca, who was then six years old.  Among other things, the agency alleged Rebecca was at substantial risk of suffering from serious emotional damage due to mother's emotionally abusive behavior (§ 300, subd. (c)), which included manipulating Rebecca into making allegations of physical and sexual abuse against father and exposing her to age-inappropriate materials and pictures about abuse.  Based on the dependency proceedings involving D., the agency also alleged that mother's emotional abuse of D. engendered a similar risk of harm to Rebecca (§ 300, subd. (j)).  At the detention hearing,

3

the juvenile court ordered Rebecca to be placed with father and ordered therapeutic visitation with mother.

In a report for the 12-month review hearing in D.'s case, the social worker noted father had been visiting with D. for two hours a week, alternating between supervised and unsupervised visits. The social worker had received ongoing feedback that father's visits were going well.

At the 12-month review hearing in April 2011, the juvenile court terminated mother's reunification services. The court ordered weekly supervised visits between mother and D. and unsupervised visits with father, including overnight visits at the agency's discretion.

In late April 2011, the juvenile court exercised its jurisdiction over Rebecca under section 300 subdivisions (c) and (j), and granted sole legal and physical custody of Rebecca to father. The court ordered monthly visits with mother were to continue in a therapeutic setting until the therapist determined visits could occur outside such setting.

At the 18-month review hearing in D.'s case on August 12, 2011, the juvenile court placed D. in father's custody and set a hearing on the agency's recommendation to change mother's visitation with D. from a supervised to a therapeutic setting. At the hearing regarding visitation on August 23, 2011, the juvenile court found it was in D.'s best interests to have visits with mother occur only in a therapeutic setting. The court also reduced visits with mother to twice a month.

On November 29, 2011, the agency filed a section 300 petition on Rebecca's behalf alleging father's physical abuse placed the child at a substantial risk of suffering serious physical harm (§ 300, subd. (a)). The same day, the agency filed a supplemental petition (§ 387) on D.'s behalf. According to the petition, on August 12, 2011, the juvenile court returned D. to father's custody under court-supervised family maintenance and ordered there was to be no corporal punishment used on the child. This placement disposition had been ineffective in protecting D. due to father's anger management issues

4

and incidents of physical violence against D. Since D.'s return to father's custody, there had been four agency referrals for physical abuse by father, one of them substantiated.

At the detention hearing in early December 2011, D. and Rebecca were placed together in a foster home and father was ordered supervised visits twice a week.

In an addendum report submitted in January 2012, the social worker observed:

> "The father continues to want to deny his part in the situations that have presented themselves and continues to state that it is the child, [D.]'s fault. [D.] is a child and the father has been informed many times that the child is not to be in charge of her own medication management. The father has been notified that the children's contact with the mother is only to be with the therapist present; however the father did not monitor the letters and did not follow the court orders.

> "The father has a close relationship with both of his children and has stated that he wants Rebecca back in his care but is not going to force [D.] if she doesn't want to come home. The father has not been willing to follow court orders with both of the children and if the child, Rebecca is placed in his care, it is likely that his complacency towards the Courts will continue.… The father has admitted to slapping the child, Rebecca in the face, he has admitted to pushing the child, [D.] when she was charging after him (it should be noted that the child, [D.] is considerably smaller than the father), and many other incidents that have already been discussed."

The social worker concluded that both mother and father continued to act without the children's best interests at heart. They disobeyed court orders and failed to accept responsibility for their actions, instead blaming others involved in the case. It was evident the children had suffered as a result of their parents' bitter custody battle and inability to parent appropriately.

In an addendum report submitted in early March 2012, the social worker reported that, on January 17, 2012, after Rebecca disclosed she had been sexually abused by D., the agency instructed the foster parents to separate the children and alarms were installed on their bedroom doors. On January 28, 2012, D. attempted to make a sexual advance towards another foster child. The agency placed D. and Rebecca in separate licensed

5

foster homes and implemented a safety plan to assure other foster children were protected from D.'s sexualized behavior.

The social worker further reported that father made statements indicating he had been aware of a number of incidents of sexualized behavior between D. and Rebecca occurring between April 2011 and November 2011. When asked why he failed to report these incidents to the children's therapists or social workers, he responded he did not think it was necessary and he felt "uncomfortable" addressing the behavior with the children.

Following the contested jurisdiction hearing, which took place in late January 2012, the juvenile court issued a written ruling on March 14, 2012, sustaining allegations against father in amended section 300 and section 387 petitions, as well as in a subsequent petition (§ 342), the agency filed on behalf of the children. In so ruling, the court found the following two incidents of physical abuse occurred: "On or about November 14, 2011, while Rebecca was in the shower, [father], as a form of punishment, struck Rebecca in the face and hip with his hand" and "On or about October 13, 2011, [father] engaged in a physical altercation with [D.]. During the physical altercation [D.]'s face was injured." The court also found that father neglected D.'s medical needs by failing to ensure she regularly received all doses of her psychotropic medication.

At the disposition hearing in May 2012, the juvenile court ordered Rebecca and D. removed from father's custody based on the facts of the sustained petitions. The court found both parents were out of time for reunification services as to D., and denied reunification services as to Rebecca based on their failure to reunify with D. The court ordered weekly supervised visits with father, twice monthly supervised visits with mother, and set a section 366.26 hearing.

In a report on Rebecca for the section 366.26 hearing, the social worker recommended the juvenile court find Rebecca adoptable and terminate parental rights. The social worker noted that visits between Rebecca and father had been going well and

6

appeared appropriate. During a visit on July 30, 2012, where D. was also present, the children enjoyed spending time with their father. They had music playing in the background and the children got up and danced around. Rebecca wanted to keep sitting on father's lap throughout the visit and he had to keep asking her to get off because he was hot.

At one point while the children and father were sitting on the floor playing with a ball, it appeared Rebecca said something that upset D. and D. withdrew herself from the visit. She went and sat by herself and would not interact with Rebecca or father. Father asked D. what was wrong, but she would not respond. Rebecca tried to get her to play, but D. ignored her and father told Rebecca to give D. some space. After a few minutes, D. started to cry and went over to father. Father told the social worker she was upset because his father had passed away unexpectedly earlier in the month. While father comforted D., Rebecca walked around the room talking about the paintings on the wall of the visiting room. She was able to lighten the mood and eventually D. cheered up and the visit went on with the children and father having a good time. When father told the children it was time for the visit to end, they both gave him a hug and a kiss and said goodbye without showing any signs of being upset the visit was over.

The social worker concluded that, while Rebecca appeared to enjoy visits with her parents, there did not seem to be any benefit to her in having the visits continue. Rebecca had adjusted to the idea she would be living permanently with her foster parents and understood parental visits were coming to an end. She did not ask to see her parents, did look forward to visits with them, or show distress when the visits ended. The social worker also noted a trend in that the visits would bring up a lot of negative memories for Rebecca regarding things that had happened in the past. Her foster parents would listen to her and help her process those thoughts and memories. The social worker noted that Rebecca's primary attachment was to her foster parents. She referred to them as mom and dad, and viewed their daughters as her sisters.

7

A CASA report for the section 366.26 hearing noted that the children had supervised visits with father once a week for two hours. There had not been any issues with visitation, but the foster parents had had to rearrange and reschedule some of the visits due to scheduling conflicts. D. had expressed some resentment to her foster mother at having to postpone trips or cancel plans because of the scheduled visits but overall had stated positive feelings towards visits with father. Rebecca displayed no adverse reactions to visits with father. Rebecca's foster parents discussed with her the possibility of visits being reduced or terminated. Rebecca responded by saying, "That's okay, they will always be in my heart."

In a report on D. for the section 336.26 hearing, the social worker recommended that a legal guardianship be established for D. with her current care providers and that her dependency be dismissed. The social worker recommended terminating parental visitation. The social worker presented the following facts informing this recommendation:

> "The child has an established relationship with her parents. The parent's separation has impacted the child's well-being in so many ways. The parent's toxic relationship has had a tremendous impact on the child. The child has stated that she wishes her parents were back together as a family. As noted in previous reports, the mother's mental health instability, and manipulation and controlling behavior, have caused the child to be stressed and confused about reality.… This confusion often leads to an emotional breakdown in the foster home. The child has a neutral relationship with her father. Although the child enjoys his company during their visits, she is not in distress if she does not have the visits. Often, when the visit comes to an end, she is eager to return with the prospective guardians. It is the opinion of this social worker that the child developed an unhealthy attachment with the parents. [¶] … [¶]

> "At this time, Legal Guardianship is in the best interest of [D.]. This placement has provided a stable home for the child. Before placement, the prospective guardian's family was an established family which provided structure and a nurturing environment for [D.] to excel in life. Equally important, the prospective guardians are committed and willing in working with the children's behavior.… This commitment has helped with [D.]'s behavior, as [D.] feels safe and secure in this home.… Since [D.] was

8

placed in this home, there have been no sexualized behaviors. In addition, there has been a significant improvement in her bed wetting. Before this placement, [D.] was wetting her bed on a daily basis, and now she is down to none, at best. Finally, the number of physical aggressions has decreased significantly since being placed in this home, to the point that [D.]'s psychotropic medication was reduced as recommended by [her doctor]. [¶] … [¶]

"As to visits with the father, the child is happy to visit with him. Usually, the father plays board games with the child while talking about daily events. These visits are going well and appropriate. When the visit ends, the child is eager to leave. The child does not cry.

"In order to establish a safe and stable permanency, it is in [D.]'s best interest that court-ordered visitation be ended with both the mother and father. As noted by the child's therapist, the child was diagnosed with Reactive Attention Disorder (RAD), which according to the Diagnostic and Statistical Manuel of Mental Disorders (DSM) is a failure to form a normal attachment with the primary caregiver in early childhood. By definition, RAD 'is associated with grossly pathological care that may take the form of persistent disregard of the child's basic emotional needs for comfort, stimulation, affection and physical needs.' As evidenced by the child's relationship with her parents, it appears that the child has not developed a mutual rewarding relationship with her parents. Since the birth of the child, the parents have maintained a dysfunctional and hostile relationship, and to add to the child's trauma the parent's divorce and the aftermath of it, added to the child's mental health instability. The some degree, the child's present emotional concerns and behaviors may be attributed to the failure to establish a healthy attachment with the parents. Based on the fact that the child failed to establish a healthy attachment with her parents, it appears that the parent/child visit does have a negative influence on the child. The child continues to have behavior issues in the foster home associated to the visits. Subsequently, the continual visitation between the parents and child may be unhealthy. Finally, the attachment process develops in time, thus, in order to further the positive relationship with the legal guardianship it is in the best interests of [D.] to terminate the parent/child visitation. [¶] … [¶]

"… Although [D.] is excited about visiting with her parents, such continual contact interferes with the child's mental health stability and with the structured environment set in place in the foster home. As evident by the child's behavior during and after visits, the child feels that the parents have some level of control over her life. It appears that the child would challenge the prospective guardian's role as a parent because the child feels

9

that the parents are still in control. At this time, the child does not have a mature understanding of why she cannot return home with her parents."

At the section 366.26 hearing on October 22, 2012, father testified he loved his daughters, but he thought it was in their best interests to be placed with their current foster families. He did, however, oppose the recommendation to terminate his visits with D. During visits, the children were affectionate towards him and D. did not have tantrums. In father's opinion, D.'s emotional and mental health had improved dramatically since her placement with her current care providers. He was now able to sit down and talk to her like an adult. But he also thought D. was susceptible to falling back into old patterns.

After considering the evidence and arguments of counsel, the juvenile court adopted the agency's findings and recommendations, which included terminating parental rights to Rebecca, ordering a legal guardianship for D., and dismissing D.'s dependency. The court further found that parental visitation "would be detrimental and not in the best interest of the child [D.]," and ordered the parents were to have no visitation, telephone contact, or other communication with D. In regard to its orders in D.'s case, the court observed:

> "[S]he's doing much better in her current placement and I believe the stability is absolutely necessary for her success in life. Based on the mental health findings, it does not seem appropriate to continue to place her in a precarious situation where she's torn between her parents and her legal guardians."

## DISCUSSION

### I. Beneficial parent/child relationship exception

Father contends the juvenile court erred by failing to apply the beneficial parent/child relationship exception to termination of his parental rights to Rebecca. He asserts he regularly visited and occupied a parental role towards Rebecca, and they shared a loving, positive, and beneficial relationship.

10

## A. *Applicable legal principles*

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child. (*In re S.B.* (2009) 46 Cal.4th 529, 532.) The Legislature's preferred permanent plan is adoption. (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if [1] it determines by clear and convincing evidence the child is adoptable within a reasonable time, and [2] the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi). (§ 366.26, subd. (c)(1).)" (*In re D.M.*, *supra*, 205 Cal.App.4th at p. 290.) In this case, father does not dispute that Rebecca is adoptable; he contends the parent/child relationship exception applies. (§ 366.26, subd. (c)(1)(B)(i).)

To avoid termination of parental rights under the parent/child relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to prove the exception applies. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

The Court of Appeal in *Autumn H.* defined a beneficial parent/child relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Id.* at p. 575.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly

11

harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 (*I.W.*).) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*In re C.F., supra,* at p. 555.)

There is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*) and *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of the existence of a beneficial sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576 [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order"]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [abuse of discretion test].)

Our conclusion in this case would be the same under any of these tests because the practical differences between the standards are "not significant," as they all give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling.... Broad deference must be

12

shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' ... '"'" (*Ibid.*) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial relationship cannot succeed unless the undisputed facts establish the existence of a beneficial parental relationship, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." ( *I.W.*, *supra*, 180 Cal.App.4th at p. 1529; *Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

### B. Analysis

Although the parties have not addressed the issue, it appears father (unlike mother) did not argue the beneficial parent/child relationship exception was applicable in the proceedings below and therefore has forfeited his argument on appeal. "The juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies." (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.) A parent who fails to raise an exception to the termination of parental rights below, waives the right to raise the issue on appeal. (*Ibid.*; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402–403.)

However, even assuming father's argument was preserved for appeal, we would reject it on the merits. Although father maintained regular visitation and contact with Rebecca, he did not meet his burden of proving Rebecca would benefit from continuing her relationship with him, as he had not shown that relationship promoted Rebecca's well-being to such a degree that it outweighed the well-being she would gain in a permanent home with the new adoptive parents. The evidence showed Rebecca was bonded to father and enjoyed visits with him. However, she showed no distress when the visits ended and had adjusted to the idea she would be living permanently with her foster parents and that visits with mother and father would soon be coming to an end. There was also evidence visits with the parents brought up troubling memories for Rebecca, which her foster parents helped her work through. Father himself testified he believed

13

Rebecca's current placement served her best interests. On this record, the juvenile court reasonably could find Rebecca's need for permanence outweighed the benefits she would derive from a continued relationship with father. It also could find that severing Rebecca's relationship with father would not deprive her of a substantial, positive emotional attachment that would greatly harm her. Accordingly, the court did not err by failing to apply the beneficial parent/child relationship exception to the termination of father's parental rights.

## II. *Termination of visitation*

Father contends the juvenile court erred in terminating visitation with D. because there was no evidence supporting the court's finding that visitation with father would be detrimental to her. According to father, the evidence only showed visits with mother would be detrimental to D. Father also asserts the court's finding of detriment with no supporting evidence deprived him of substantive due process.

### A. *Applicable legal principles*

Prior to permanency planning, during reunification efforts, visitation generally must be as frequent as possible, consistent with the well-being of the dependent child. (§ 362.1, subd. (a)(1)(A).) When reunification services are terminated and a permanency planning hearing set, the court must continue to permit the parent to visit the child pending the hearing unless it finds visitation would be detrimental to the child. (§ 366.21, subd. (h).) Moreover, where the juvenile court has selected a permanent plan of either guardianship or long-term foster care for the dependent child, it must order visitation with the parent unless the court finds by a preponderance of the evidence that visitation would be detrimental to the child. (§ 366.26, subd. (c)(4)(C); Cal. Rules of Court, rule 5.725(d)(7)(E); *In re Randalynne G.* (2002) 97 Cal.App.4th 1156, 1163.) Consequently, upon a finding of detriment, the juvenile court is empowered to terminate visitation between a parent and child.

14

The power to regulate visitation between parents and dependent minors rests with the court. (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.) The juvenile court has great discretion in deciding visitation issues and we will not disturb the juvenile court's decision absent an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) However, our conclusion would also be the same under the substantial evidence test father urges us to use in evaluating the court's decision to terminate visitation with D.

**B.       Analysis**

Contrary to father's suggestion, evidence of the quality of his visits with D. was not the only evidence the juvenile court could consider in determining whether continuing visits would be detrimental to her. The court could also consider evidence of D.'s extreme psychological fragility and her lack of a healthy attachment to either parent—to which father's past violent behaviors had clearly contributed despite his attempts to minimize them on appeal. In light of this evidence and evidence of D.'s immaturity and inability to understand why she could not return home to her parents, the court could reasonably find that continuing visits with father would likely give rise to a sense of conflicting loyalties and interfere with the process of forming a healthy, positive attachment to her guardians and undermine the stability and sense of permanence so essential to her well-being. Because the court's finding of detriment was supported by the evidence, the court did not abuse its discretion or deprive father of substantive due process in terminating visitation with D.

## *DISPOSITION*

The juvenile court's orders issued on October 22, 2012, are affirmed.

_____
HILL, P. J.

WE CONCUR:


_____
WISEMAN, J.


_____
LEVY, J.